IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| STACEY LYNNE GADBOIS, <br><br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, <br> Acting Commissioner, <br> Social Security Administration, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )   CIVIL ACTION NO. 2:15-cv-107 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## REPORT AND RECOMMENDATION

Plaintiff Stacey Lynne Gadbois ("Ms. Gadbois") filed a complaint pursuant to 42 U.S.C. § 405(g) that seeks judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Commissioner"), denying Ms. Gadbois' claim for Disability Insurance Benefits pursuant to Title II of the Social Security Act. Both parties have filed motions for summary judgment, ECF Nos. 11 and 13, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, ECF Nos. 12 and 14, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned RECOMMENDS that Ms. Gadbois' Motion for Summary Judgment,

ECF No. 11, be **DENIED**; the Commissioner's Motion for Summary Judgment, ECF No. 13, be

**GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this

matter be **DISMISSED WITH PREJUDICE**.

# I. PROCEDURAL BACKGROUND

Ms. Gadbois filed an application for disability and disability insurance benefits on

September 26, 2010, alleging a disability onset date of October 1, 2008. R. 153.[1] Ms. Gadbois'

date last insured ("DLI") is September 30, 2011.  *Id.* at 161.[2]  The application was initially

denied on January 26, 2011, *id.* at 89, and denied again upon reconsideration on December 14,

2011, *id.* at 106. Ms. Gadbois requested a hearing in front of an Administrative Law Judge

("ALJ"), *id.* at 124, which was held on December 12, 2012, *id.* at 45-79. The ALJ issued his

decision on January 7, 2013, denying Ms. Gadbois' application.  *Id.* at 28-39.  The Appeals

Council for the Office of Disability and Adjudication ("Appeals Council") denied Ms. Gadbois'

request for review of the ALJ's decision on January 9, 2015.  *Id.* at 16.  After exhausting her

administrative remedies, Ms. Gadbois filed her Complaint for judicial review of the Acting

Commissioner's final decision on March 13, 2015. ECF No. 1. The Acting Commissioner filed

an answer on May 18, 2015.  ECF No. 7.  Both parties filed motions for summary judgment,

ECF Nos. 11 and 13, and the matter is now ripe for adjudication.

---

[1] "R." refers to the certified administrative record that was filed under seal on May 20, 2015, ECF No. 8, pursuant to Local Civil Rules 5(B) and 7(C)(1).
[2] A claimant is only eligible for disability insurance benefits if found to be disabled on or before her DLI. *See* 42 U.S.C. § 423; 20 C.F.R. § 404.130; *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005). Thus, to receive benefits, Ms. Gadbois must be found to have become disabled on or before September 30, 2011.

## II.  RELEVANT FACTUAL BACKGROUND

In her application, dated September 26, 2010, Ms. Gadbois alleged a disability onset date of October 1, 2008.  R. 153.  At the time of the ALJ's decision, Ms. Gadbois was a thirty-five-year-old married female with a college education and past work experience as a physical therapist assistant.  *Id.* at 49.  At the hearing held on December 12, 2012, Ms. Gadbois supplemented her medical records by providing additional information via testimony. The record included the following factual background for the ALJ to review:

In addition to being diagnosed with Lyme disease in October of 2008, Ms. Gadbois was diagnosed with immunodeficient-related infections such as Bartonella, Mycoplasma, and Babesia between 2008 and 2010.  *Id.*  Ms. Gadbois is unsure of the date she actually contracted the disease since it is transmitted through a tick bite and she was bit in both 1989 as well as 2002.  *Id.* at 50.  Ms. Gadbois stated that as a result of the infections she has anxiety but was not on antianxiety medication at the time of the hearing.  *Id.*  She was last employed as a physical therapist assistant and a director of rehab services in 2008 but left in September of that year due to dizziness, loss of balance, weakness, fatigue, and trouble with coordination and memory.  *Id.* at 52.

Ms. Gadbois did not need an assistive walking device the date of the hearing but she stated that at times she cannot walk and she has a cane at home.  *Id.* at 53.  She did, however, arrive to the hearing on oxygen as directed by her pulmonologist, Dr. Carlos Silva ("Dr. Silva"), who found that Ms. Gadbois' oxygen levels were dropping upon exertion.  *Id.*  Ms. Gadbois stated that she has to use oxygen whenever she is walking around or moving about.  *Id.*  She stated that she essentially stopped walking at the end of August 2012 when her health started to

go "downhill." *Id.* at 56. Her doctors encourage her to walk to promote lymphatic drainage and help manage pain, and Ms. Gadbois confirmed walking does manage pain. *Id.* She stated she will occasionally use a treadmill at home and walk at a slow pace, but not daily. *Id.* at 57. However, she was diagnosed with adrenal insufficiency which she testified means that she does not produce enough cortisol to balance out her adrenaline. *Id.* at 62. As a result, whenever she gets worked up or excited she gets exhausted, starts sweating, her blood pressure drops and she feels like she is about to pass out. *Id.* at 63.

Ms. Gadbois also testified that she does light housework that consists of laundry or light vacuuming on her good days. *Id.* at 53. She started keeping a log of her good and bad days:

> I wrote down every day what I could do and what I couldn't do so that I could have an objective measurement. Of the 58 days that I documented here, being October 15 until today, I had 10 good days. And again, those are days that I was able to move around, and do some light housework, and be responsible solely for myself and my daughter.

*Id.* at 54. Ms. Gadbois added that her driving is very limited, and she was only able to drive on 10 out of the 58 days as well. *Id.* However, Ms. Gadbois testified that before the hearing her neurologist put a medical hold on her driver's license, prohibiting her from driving. *Id.* She claimed this was because she began IV immunotherapy at the end of July 2011 and started having "seizure like episodes" that involved dizziness and made driving unsafe. *Id.* at 55. She stated that her neighbor drives her daughter to and from school. *Id.*

Ms. Gadbois further testified that she does not go shopping regularly but that if her husband is along with her then she may wander through Target for ten to fifteen minutes. *Id.* Ms. Gadbois also has a five-year-old daughter that is "relatively self-sufficient" and takes care of her own personal care but Ms. Gadbois will make her breakfast. *Id.* at 55-56. She also stated

4

that she tries to make dinner if she is feeling good but will usually make large quantities of food at a time in order to heat up leftovers throughout the week. *Id.* at 56. Ms. Gadbois also stated that at most she can lift ten pounds but she cannot lift or carry her thirty-two-pound daughter but can put her daughter on her lap. *Id.* at 57. As for sitting, Ms. Gadbois testified that she still gets dizzy and has to change her positions often. *Id.* at 58. She noted that her most interfering and impacting symptoms are dizziness, loss of balance, and cognition issues in addition to fatigue. *Id.* at 59-60. Regarding cognition specifically, Ms. Gadbois stated that she was diagnosed with some convergence insufficiencies and vision problems that make reading difficult: "My brain doesn't process the stimuli that's coming in through my eyes . . . so my eyes don't work together. When I look at a page, I have to work very hard to start at the left alignment and read to the right. My eyes bounce all around the page, and it makes it very difficult to stay on task." *Id.* at 60, 63. She also has a sensitivity to light and sound and was wearing sunglasses at the hearing. *Id.* at 62. Ms. Gadbois stated that she stopped IV immunotherapy in November of 2012 and was recently put on antifungal medication in addition to an eye ointment she wears at night. *Id.* at 59.

As a result of joint stiffness caused by Lyme disease and muscle stiffness caused by Babesia, she also experiences pain in the back of her neck, her head, the top of her shoulders, and down the back of her legs. *Id.* at 61. As of the hearing, Ms. Gadbois was not taking any specific pain medication because it did not mix well with antibiotics but did use herbal medication such as Epsom salts and heat packs. *Id.* at 61-62, 65. In addition to joint pain, Ms. Gadbois stated she gets migraine headaches every seven to ten days. *Id.* at 64. These headaches entail a period of confusion followed by vision loss, vomiting, and bladder control. *Id.* One side effect of the Babesia is tremors where her hands shake and lock up (along with her jaw). *Id.* at 65.

5

Because Ms. Gadbois' husband is in the Navy and spends a lot of time away either on the ship or on specific deployments, Ms. Gadbois' father-in-law moved in with her and her husband in December of 2012 to help care for Ms. Gadbois. *Id.* Ms. Gadbois' mother, Karen Price ("Ms. Price"), testified at the hearing. *Id.* at 66. Ms. Price stated that though she lives in another state, she visits Ms. Gadbois quite frequently and has observed her on both good and bad days; observing weakness, dizziness, and fatigue. *Id.* at 67-68. Ms. Price also mentioned that Ms. Gadbois was having seizure-like episodes within the last two weeks where she knew that her family was talking to her but she was unable to respond and unable to walk. *Id.* at 68. Ms. Price included that many of these symptoms started about six years prior to the hearing when she became pregnant with her daughter. *Id.* at 69.

Ms. Gadbois' father-in-law, Robert Gadbois ("Mr. Gadbois"), also testified. *Id.* at 74. Mr. Gadbois stated that he moved to Virginia from Southern California to help take care of Ms. Gadbois (his daughter-in-law) and her daughter (his granddaughter), while his son was away on deployment with the Navy. *Id.*

According to her medical records, Ms. Gadbois was thirty-one years old at her disability onset date. *Id.* at 37. On April 7, 2009, about six months after her alleged onset date, Ms. Gadbois sought treatment from Dr. S. Habeeb Rahman, M.D. ("Dr. Rahman"), complaining of "intermittent episodes of dizziness, tremors, weakness, and rigidity of her muscles as well as headaches related to menstrual periods." *Id.* at 382. Ms. Gadbois stated to Dr. Rahman that over the past several months she was dealing with these episodes and had an MRI scan of the brain in September of 2008 that came back normal. *Id.* Dr. Rahman recommended a repeat MRI scan of the brain as well as cervical spine. *Id.* at 383. Ms. Gadbois returned on May 18, 2009,

complaining of the same symptoms:  "She continues to have multiple neurologic symptoms without any significant change, although the intensity of her symptoms fluctuate considerably." *Id.* at 380.  Dr. Rahman started her on a trial of Topamax (25 mg daily).  *Id.*  Ms. Gadbois returned about a month later with the same complaints, again indicating they fluctuate but that there were no new neurological or visual symptoms.  *Id.* at 379.  Ms. Gadbois saw Dr. Rahman again in July, *id.* at 378, and again in August, *id.* at 377, with no overall change in her condition but noted she had the same neurological complaints as prior visits.  *Id.*

In September of 2009, Ms. Gadbois had an epitope test which confirmed a positive result for Lyme disease.  *Id.* at 292.  In October of 2009, Ms. Gadbois sought treatment from Dr. Warren Levin, M.D. ("Dr. Levin").  *Id.* at 362.  Ms. Gadbois complained of dizziness, migraines, and fatigue, with tremors that appeared to have subsided slightly since August of 2009.  *Id.*  On October 21, 2009, Dr. Levin put Ms. Gadbois on a yeast-free diet in an attempt to reduce the frequency of her migraines.  *Id.* at 363.  He also began treating her for Lyme disease.  *Id.*  In a follow-up, Ms. Gadbois indicated that her migraines were less frequent and she only had one eleven days prior to the follow-up after deviating from her yeast-free diet.  *Id.* at 362.  In November of 2009, Dr. Levin described Ms. Gadbois' symptoms as similar to mild Parkinson's disease.  *Id.* at 358.  Upon exam, Dr. Levin also stated that Ms. Gadbois had muscle rigidity in her fingers, wrists, and elbows.  *Id.* at 358.  During this time, Ms. Gadbois was on various antibiotics to treat the Lyme disease symptoms.  *Id.* at 355.  In December of 2009, Dr. Levin had her discontinue Clarithroycin and start a new antibiotic as well as continue Nystatin and Bicillin in order to fend off co-infections.  *Id.* at 355-57.

Ms. Gadbois returned to see Dr. Rahman on April 21, 2010.  *Id.* at 384.  Dr. Rahman

indicated that Ms. Gadbois stated she continued to have symptoms including vague transient visual symptoms, twitching and tremors, numbness, and loss of balance. *Id.* Dr. Rahman did a physical examination, which revealed normal muscle mass, tone, and strength in all groups of muscles. *Id.* "There were no involuntary movements. There were no sensory deficits. . . . Gait, including tandem walking, was within normal limits." *Id.* He also noted that an MRI scan of the brain revealed a mild degree of a "Chiari 1 malformation" but an MRI of her spinal column was unremarkable. *Id.* Dr. Rahman recommended another MRI scan of the brain and an electrodiagnostic study. *Id.*

Ms. Gadbois began treatment with Dr. Paul Beals, M.D. ("Dr. Beals") on May 4, 2010. *Id.* at 453. Ms. Gadbois reported to Dr. Beals that she was having fatigue, drenching night sweats, shortness of breath, headaches, joint pain, difficulty falling asleep, and anxiety. *Id.* She appeared to have normal physical abilities such as gait and movement of the neck, she also had a normal chest and lung exam, normal cardiovascular exam, normal abdomen, normal neuropsychiatric exam, and a normal musculoskeletal exam with normal strength, tone, range of motion, and no pain. *Id.* at 453-54. Dr. Beals recommended she take three antibiotics, probiotics, use a Myers IV drip once a week, take B12 and Folate vitamins, and see a specialist for Mercury detox. *Id.* at 455.

On May 11, 2010, Ms. Gadbois saw Dr. Patrick F. Kilhenny, M.D. ("Dr. Kilhenny") at the Neurology and Neuro-Ophthalmology Center in Chesapeake, Virginia. *Id.* at 406. In reviewing Ms. Gadbois' history, Dr. Kilhenny reported that Ms. Gadbois used to be a long-distance runner but now only walks a mile or two a day. *Id.* In his assessment, Dr. Kilhenny stated that Ms. Gadbois had a history of seropsitivity to Lyme disease. *Id.* at 407. Dr. Kilhenny

8

also indicated that Ms. Gadbois complained of general symptoms including tremors, vision affects, and vertigo; however, upon examination Dr. Kilhenny found no evidence of tremors, and only a slight visual field constriction but her vision exam was essentially unremarkable overall. *Id.* at 406-07. Again, Dr. Rahman treated Ms. Gadbois in May 17, 2010. *Id.* at 397. All results appeared to be unchanged but Dr. Rahman indicated that Ms. Gadbois' symptoms, at least in part, could be caused by the Chiari malformation since it affects spinal fluid and the nervous system. *Id.*

On January 25, 2011, state agency physician Patricia Staehr, M.D. assessed Ms. Gadbois' alleged impairments and noted that though Ms. Gadbois' condition resulted in some limitations in her ability to perform work-related activities, those limitations did not prevent her from performing past work. *Id.* at 90.

On March 10, 2011, Dr. Kenneth Westcott, O.D. ("Dr. Westcott") conducted a visual efficiency and visual information processing test on Ms. Gadbois. *Id.* at 578-80. Dr. Westcott stated in his report that Ms. Gadbois had a significant amount of nearsightedness but with glasses can see both far and near. *Id.* at 578. Her eyes appeared to be healthy and free of disease. *Id.* Dr. Westcott reported that Ms. Gadbois had convergence insufficiency as well as oculomotor dysfunction or eye teaming, visual tracking, and eye movement control problems. *Id.* "Poorly developed eye teaming skills may result in double vision, headaches, eyestrain, poor reading comprehension, skipping, substituting, omitting small words when reading, and inability to sustain a visual task for any prolonged period of time. Inadequate eye movement control may cause loss of place when reading, difficulty copying form the chalkboard, and skipping or re-readings lines of print." *Id.* Dr. Westcott also noted that Ms. Gadbois had "visual perceptual

9

difficulties that interfere with her ability to process, analyze, and act upon what she is seeing." *Id.* at 579. Dr. Westcott recommended that Ms. Gadbois try using a home-based computer assisted software program related to vision therapy. *Id.*

On July 26, 2011, Ms. Gadbois saw Dr. Carlos A. Silva, M.D. ("Dr. Silva") at Bon Secours Depaul Medical Center. *Id.* at 768. Ms. Gadbois was having issues with shortness of breath and had a pulmonary function test. *Id.* Her pulmonary function test demonstrated normal forced vital capacity, adequate exhalation time, but showed severely decreased diffusion capacity. *Id.* Dr. Silva also indicated that Ms. Gadbois' "inhalation is incomplete and hesitant," and after monitoring Ms. Gadbois as she walked for six minutes, he noticed a "very sharp drop of her saturation baseline in . . . less than 1 minute." *Id.* at 771. Dr. Silva put Ms. Gadbois on an oxygen supplement and ordered a CAT scan of her chest. *Id.*

On September 14, 2011, Dr. Silva wrote a letter to Dr. William Reed, M.D. and stated that he met with Ms. Gadbois for a pulmonary follow-up regarding her chest issues. *Id.* at 790. He noted that Ms. Gadbois' pulmonary issues appeared to be "ameliorating" but that she had Raynaud's phenomenon. *Id.* Dr. Silva also stated that Ms. Gadbois "remains very active exercising. Overall, she is improving." *Id.* A month later Dr. Silva wrote another letter to Dr. Reed. *Id.* at 792. He stated that Ms. Gadbois continued to remain active and exercise and that she no longer required oxygen twenty-four hours a day. *Id.*

On December 12, 2011, state agency physician R.S. Kadian, M.D. reviewed all the evidence in Ms. Gadbois' file and found that Ms. Gadbois' condition resulted in some limitations that prevented her from performing past work; however, she "would have been able to perform work that was less demanding on or before 09/30/2011" and that Ms. Gadbois was not disabled

through her DLI. *Id.* at 106.

On May 17, 2012, Ms. Gadbois met with Dr. Lee Kanter, M.D. ("Dr. Kanter") for a cardiology follow-up. *Id.* at 806. He stated that Ms. Gadbois "had no recurrent syncope, is feeling better, less dizziness, weakness, breathing better, less fatigue, no heart fluttering. . . . She is able to run 10 miles a week and do the gym 3 times per day. Is back working in physical therapy." *Id.* Dr. Kanter did not recommend any specific treatment. *Id.*

On November 29, 2012, Dr. Beals summarized his treatment and history with Ms. Gadbois. *Id.* at 1060. Dr. Beals indicated he had been treating Ms. Gadbois for insect illnesses and common variable immune deficiency, along with other infections since August of 2009. *Id.* He related her general symptoms—dizziness, loss of balance, headaches, vision problems, tremors, cognitive dysfunction, etc.—and stated that he "recently uncovered through lab tests recently [sic] that [Ms. Gadbois] has an Immune Deficiency. She has tested positive for multiple infections including Lyme, Mycoplasma, Bartonella, and high levels of toxic heavy metals." *Id.* He also noted that Ms. Gadbois recently developed what appeared to be seizure-like episodes. *Id.* Dr. Beals concluded: "[I]t is my opinion that, because of her objective medical findings, her daily activities are so interrupted with her illnesses it would be impossible to work at this time." *Id.* at 1061.

On December 12, 2012, Dr. Beals filled out a "Physical Residual Functional Capacity Evaluation," finding that Ms. Gadbois was "incapable of low stress jobs, but hopes to change that in the future." *Id.* at 1043. He also stated that Ms. Gadbois can sit for about twenty minutes and stand between ten and twenty minutes at a time. *Id.* He concluded that within an eight-hour work day Ms. Gadbois could sit for between four and six hours and stand between two and four

hours. *Id.* at 1045.

In addition to filing the present Complaint on March 13, 2015, Ms. Gadbois attached four additional documents regarding her health care that were not in the administrative record when the ALJ made his final decision, nor in the record upon review by the Appeals Council. ECF No. 1 attachs. 1-4.

## III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make

a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, the ALJ found that Ms. Gadbois did not engage in substantial gainful activity since October 1, 2008, the alleged onset date of disability. R. 30. Second, Ms. Gadbois had the following severe impairments: arthritis (cervical) and variable immune deficiency. *Id.* (citing 20 C.F.R. § 404.1520(c)). Third, Ms. Gadbois did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 32. The ALJ assessed the severe impairments under listings 1.00 (Musculoskeletal System) and 14.00 (Immune System). *Id.* The ALJ explained why Ms. Gadbois' arthritis did not reach the severity of listing 1.00, but did not address why her immune system impairment did not reach the severity required under listing 14.00. *Id.* Fourth, the ALJ found that Ms. Gadbois had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with the following limitations: Ms. Gadbois could not engage in any climbing, work at unprotected heights; work around dangerous machinery; operate motor vehicles or motorized conveyances; and had to avoid exposure to extreme temperatures (hot or cold); and avoid exposure to bright lights. *Id.* Fifth, while Ms. Gadbois is unable to perform any past relevant work, the ALJ found that considering her age,[3] education,

---

[3] Ms. Gadbois was thirty-four years old at the time of the hearing. R. 37. Thus, she is defined as a "younger individual age 18-44" as of her DLI. *Id.* (citing 20 C.F.R. § 404.1563).

work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Gadbois could perform. *Id.* at 38. The ALJ, relying on the VE's opinion, found that suitable jobs would consist of telephone solicitor, order clerk, and receptionist—all sedentary and unskilled jobs. *Id.* Therefore, the ALJ determined that Ms. Gadbois had not been under a disability from October 1, 2008, through September 30, 2011. *Id.*

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Acting Commissioner's denial of benefits is supported by

substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.


## V. ANALYSIS

### A. The Four Attachments to Ms. Gadbois' Complaint Are Not New and Material Evidence That Would Warrant a Sentence Six Remand.

As mentioned, Ms. Gadbois attached four additional documents regarding her health care that were not in the administrative record and considered  at the administrative-level of review. These documents consist of a January 2013 diagnostic study that confirms Ms. Gadbois was diagnosed with Postural Orthostatic Tachycardia Syndrome ("POTS"), a January 2015 statement from Dr. Kanter, her pulmonologist, indicating that Plaintiff probably had POTS since 2006, and two letters from Dr. Parimal J. Soni ("Dr. Soni") and Dr. Silva who both conclude Ms. Gadbois was unable to work full time prior to September 30, 2011. ECF No. 1 attachs. 1-4. Ms. Gadbois asked this Court to conclude that remand back to the administrative level is necessary because these documents should be considered at the administrative level of review. ECF No. 12 at 18-20. Ms. Gadbois argued that remand is warranted pursuant to 42 U.S.C. § 405(g) for proper consideration of new and material evidence as well as the factors in *Borders v. Heckler*, 777 F.2d 954 (4th Cir. 1985). *Id.* at 18. The Commissioner argued in response that the evidence attached to Ms. Gadbois' complaint is neither "new" nor "material," and Ms. Gadbois did not establish good cause for why she did not have this evidence before the ALJ. ECF No. 14 at 12-13.

Section 405(g) of the Social Security Act states in part:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand

the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding

42 U.S.C. § 405(g) (also known as a "sentence six remand" as it refers to the Court's ability to remand the decision based on the sixth sentence of § 405(g)). Further, the Fourth Circuit explicated the sentence-six remand standard in *Borders v. Heckler*, generally reasoning that a reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence. *Parker v. Colvin*, No. 3:14CV502, 2015 WL 5793695, at *24 (E.D. Va. Sept. 29, 2015) (citing *Borders v. Heckler,* 777 F.2d 954, 955 (4th Cir.1985)). Because Ms. Gadbois submited four documents for the Court to consider, the Court will address each of them under the standard:

Attachment 1: Autonomic Lab Testing: POTS

The first attachment is Ms. Gadbois' lab results after receiving an abnormal cardiovascular autonomic test on January 3, 2013. ECF No. 1 attach. 1. Dr. Kamal R. Chemali concluded that Ms. Gadbois' test results were "consistent with the diagnosis of [POTS]." *Id.* The Commissioner argued that evidence confirming the diagnosis of POTS is not material. ECF No. 14 at 14. The evidence proffered by Ms. Gadbois is neither cumulative nor duplicative of evidence submitted in the prior proceeding, inasmuch as the POTS diagnosis was not made until

16

about a year after the ALJ's decision.  For the same reason, good cause exists for Ms. Gadbois'

failure to produce the POTS diagnosis evidence prior to the ALJ's December 2012 decision.

And, Ms. Gadbois has made a general showing of the new evidence to this Court.  Hence, these

elements have been satisfied, and the remaining question is whether the evidence is relevant to

the determination of disability at the time Ms. Gadbois filed her application and the

Commissioner's decision might reasonably have been different had the new evidence been

considered.  Stated another way, the question is, was the new evidence "material?"  Though the

Commissioner conceded that this diagnosis was not in the record before the ALJ, she argued that

the ALJ considered all of Ms. Gadbois' POTS-like symptoms in determining her limitations.

Ms. Gadbois responded that the diagnosis is material because it provides an "explanation . . . for

medical issues which were present before the ALJ at the time of the hearing."  ECF No. 15 at 4.

The Commissioner is correct.  The official diagnosis of POTS is not material.  "New

evidence must be material to the extent that the Commissioner's decision 'might reasonably have

been different' had the new evidence been before him."  *Bagbey v. Colvin*, No. 3:13CV298-

HEH, 2014 WL 791871, at *10 (E.D. Va. Feb. 24, 2014); *Wilkins v. Sec'y, Dep't of Health &*

*Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) ("Evidence is material if there is a reasonable

possibility that the new evidence would have changed the outcome.").  It cannot be said that the

diagnosis of POTS as the cause or explanation for all Ms. Gadbois' symptoms would have

reasonably changed the Commissioner's decision.  All the document did was provided a label—

it did not present symptoms that Ms. Gadbois could have had before her DLI—it merely

diagnosed the cause of symptoms Ms. Gadbois experienced and already had presented before the

ALJ.   "The mere presence of a disease or medically determinable impairment does not

17

automatically entitle a claimant to a disability period or disability insurance benefits under the Social Security Act." *Gotshaw v. Ribicoff*, 307 F.2d 840, 844 (4th Cir. 1962). Disability is not determined by mere diagnosis, but by functional limitations caused by medically determinable impairments. 20 C.F.R. § 404.1521. *See Fagg v. Charter*, 106 F.3d 390, 1997 WL 39146, *1-*2 (4th Cir. 1997) (unpublished decision) (holding that evidence was not material because it did not indicate that the claimant was disabled or limited by the impairment during the relevant period under consideration by the ALJ); *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3rd Cir.1984). The new evidence Ms. Gadbois proffered showed that, as of January 2013, she suffered from POTS. It does not, however, show anything about Ms. Gadbois' condition and ability to work on or before the date of the Commissioner's determination. *See Campbell v. Astrue*, No. 2:11CV563, 2013 WL 1213057, at *8 (E.D. Va. Mar. 1, 2013) *report and recommendation adopted sub nom. Campbell v. Colvin*, No. 2:11CV563, 2013 WL 1213090 (E.D. Va. Mar. 25, 2013). Accordingly, the undersigned finds Attachment 1 is not admissible as new and material evidence under a sentence six remand. *See* 42 U.S.C. § 405(g).

Attachment 2:  Letter from Dr. Kantar

The second attachment is a letter from Ms. Gadbois' pulmonologist, Dr. Kantar, dated January 27, 2015. ECF No. 1 attach. 2. The letter stated that Ms. Gadbois had "neurocardiogenic syncope" and that "it has probably been present since 2006 based on symptoms, even though the diagnosis was delayed until 2013. *Id.* Dr. Kantar specified that the contributing symptoms were dizziness, fatigue, low blood pressure, faintness, slurred speech, and recurrent syncope associated with hypertension. *Id.* Dr. Kantar also added that even though he only first evaluated Ms. Gadbois in October of 2011, "she had the symptoms that sounded to be

autonomic dysfunction neurocardiogenic syncope and recurrent syncope that had been going on for years prior to 2011." *Id.*

Similar to Attachment 1, the newly presented letter from Dr. Kantar did not present material evidence. The letter merely provided another name (neurocardiogenic syncope) to sum up Ms. Gadbois' symptoms. It is not the case that "[n]o other evidence specifically addressed this issue," but merely the case that the letter lists the same symptoms already presented to the ALJ. *See Wilkins*, 953 F.2d at 96. Dr. Kantar even mentioned in the letter that the neurocardiogenic syncope "resulted in chronic symptoms of dizziness, fatigue, low blood pressure, faintness, slurred speech, and recurrent syncope associated with hypotension." ECF No. 1 attach. 2. These are the same symptoms presented to the ALJ in both Ms. Gadbois' testimony and her subjective complaints in the objective medical evidence in the record. *See Ahnen v. Colvin*, No. 3:14CV098 JRS, 2015 WL 868107, at *18 (E.D. Va. Feb. 27, 2015) (finding a physician's letter presented in a sentence-six remand situation not material because the letter "merely agreed with substantive evidence already before the ALJ"); *Pallett v. Astrue*, No. 3:09CV819, 2010 WL 2696283, at *6 (E.D. Va. May 27, 2010) *report and recommendation adopted*, No. 3:09-CV-819, 2010 WL 2696653 (E.D. Va. July 7, 2010) (finding the newly presented evidence immaterial because "the evidence supplied by Plaintiff was merely cumulative insofar as the physicians' opinions are based upon the same objective evidence already considered by the ALJ"). Further, it is not evident Ms. Gadbois has shown "good cause" as to why she failed to submit the evidence before the Commissioner because Dr. Kantar initially evaluated Ms. Gadbois in October of 2011, over a year prior to the hearing before the ALJ. ECF No. 1 attach. 2. If her symptoms during that time were as debilitating in her ability to work as

stated, evidently Ms. Gadbois could have included such a letter on the record before the ALJ. *Cf. Parker v. Colvin*, No. 3:14CV502, 2015 WL 5793695, at \*25 (E.D. Va. Sept. 29, 2015) ("There is good cause for Plaintiff's failure to submit the evidence earlier simply because Dr. Bloem saw Plaintiff, examined her MRIs and completed a Multiple Impairment Questionnaire after the ALJ's decision."). Accordingly, the undersigned finds Attachment 2 is not admissible as new and material evidence under a sentence six remand. *See* 42 U.S.C. § 405(g).

Attachment 3: Letter from Dr. Soni

The third attachment is a letter from Dr. Soni, who started seeing Ms. Gadbois in late 2012. ECF No. 1 attach. 3. Dr. Soni's letter contains a timeline and summary of the progression of Ms. Gadbois' illness. *Id.* Dr. Soni concluded, "It is rather a norm to see the patient suffer for many years and in some cases a decade before a proper diagnosis is made. In [Ms. Gadbois'] case symptoms were present as early as 1996. . . . [S]he would not have been able to function in the workplace on a daily basis for an eight hour workday prior to September 30, 2011 as her symptoms existed prior to that date and are based on her diagnosis of POTS and [neurocardiogenic syncope]." *Id.* at 3-4. The Defendant argued that this evidence is not material because, again, "[t]he ALJ explicitly considered these very symptoms and associated functional limitations when assessing [Ms. Gadbois'] RFC." ECF No. 14 at 14.

While it is not improper for a later-examining physician to offer an opinion on a patient's prior disabling condition, *see Wilkins*, 953 F.2d at 96 (citing *Wooldridge v. Bowen,* 816 F.2d 157, 160 (4th Cir.1987) ("This court has recognized that a treating physician may properly offer a retrospective opinion on the past extent of an impairment."), the opinion in this case is not material as it presents no new evidence. Dr. Soni's letter practically recites the same history and

symptoms as are in Ms. Gadbois' medical record, which was considered by the ALJ. It cannot

be said that the Commissioner's decision 'might reasonably have been different' had the new

evidence been before him. *See Bagbey*, 2014 WL 791871, at *10; *cf. Wilkins*, 953 F.2d at 96;

*Wilson v. Colvin*, No. 2:14CV555, 2015 WL 5561145, at *15 (E.D. Va. Sept. 17, 2015) (noting

that the evidence should not be considered as "it relates to progression of her symptoms after the

date of the ALJ's decision, and thus outside the period of time governed by the decision under

review"). Accordingly, the undersigned finds Attachment 3 is not admissible as new and

material evidence under a sentence six remand. *See* 42 U.S.C. § 405(g).

Attachment 4: Letter from Dr. Silva

      The fourth attachment is a letter from Ms. Gadbois' treating pulmonologist, Dr. Silva.

ECF No. 1 attach. 4. The letter provided a recitation of a most recent appointment assessment

from February 25, 2015. *Id.* Dr. Silva stated,

> Given the diagnosis of POTS . . . in January 2013 it is reasonable to state that she
> had this condition (POTS) prior to September 30, 2011 as she was symptomatic
> prior to that date and those symptoms are consistent with the manifestations of
> POTS and these would make her essentially unable to perform her duties in her
> workplace on a day to day basis for the usual 8 hours work day.

Again, the Commissioner responded that Dr. Silva's letter was not material and that Ms. Gadbois

did not show good cause for not introducing it before the ALJ. *Id.* First, Dr. Silva concluded that

Ms. Gadbois reasonably had POTS prior to September 30, 2011 and that these symptoms "would

make her essentially unable to perform her duties in her workplace . . . ," but Dr. Silva presented

no *new* evidence as to why Ms. Gadbois would have been unable to work prior to September 30,

2011. Second, again it is not evident that Ms. Gadbois has shown "good cause" as to why she

failed to submit the evidence before the Commissioner because Dr. Silva initially evaluated Ms.

Gadbois in July of 2011, over a year prior to the hearing before the ALJ. ECF No. 1 attach. 2. If her symptoms during that time were as debilitating in her ability to work as stated, evidently Ms. Gadbois could have included such an opinion from Dr. Silva in the record before the ALJ. And third, Dr. Silva's February 25, 2015 opinion contradicted his progress notes in 2011 and 2012, in that he stated Ms. Gadbois had improved, been active, and continued to exercise. R. 792. Thus, the Commissioner's decision reasonably would not have been different had the evidence been before him. Accordingly, the undersigned finds Attachment 4 is not admissible as new and material evidence under a sentence six remand. *See* 42 U.S.C. § 405(g).

**B. The ALJ's Assessment of Ms. Gadbois' RFC is Supported by Substantial Evidence in the Record And it is Not Contrary to *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012).**

Ms. Gadbois argued that the ALJ's statements finding Dr. Beals' medical opinions to be made after Ms. Gadbois' DLI were contrary to the Fourth Circuit's opinion in *Bird*, requiring the ALJ to consider post-DLI medical evaluations as potentially relevant to prove a disability before the DLI. ECF No. 12 at 20. The Commissioner responded that unlike the ALJ in *Bird*, the ALJ here "did not bar consideration of Dr. Beals' opinions because of their timing; but instead, he considered the evidence of record both before and after he date last insured." ECF No. 14 at 19.

In *Bird*, the Fourth Circuit upheld the notion that "[m]edical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird*, 699 F.3d at 340 (citing *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir.1987) and *Moore v. Finch*, 418 F.2d 1224,

22

1226 (4th Cir.1969)). In assessing Ms. Gadbois' RFC, the ALJ addressed Dr. Beals' treatment of Ms. Gadbois. R. 35-36. The ALJ first reviewed a medical source statement (a physical RFC evaluation) that Dr. Beals provided in November of 2012. *Id.* at 35. The ALJ summarized Dr. Beals' findings in his opinion but ultimately rejected Dr. Beals' findings as not supported by substantial evidence and inconsistent with substantial evidence. *Id.* And though the ALJ specifically stated that the evaluation "was made long after September 30, 2011, the date last insured," he also added that Dr. Beals' opinion was "inconsistent with [Ms. Gadbois'] extensive activities of daily living and conservative treatment history. Furthermore, [Ms. Gadbois] was in no distress at the hearing." *Id.* The ALJ then considered a November 29, 2012 letter from Dr. Beals that addressed Ms. Gadbois' symptoms and concluded that she was incapable of working because "her daily activities were so interrupted with her illness." *Id.* at 35-36. Again, the ALJ rejected Dr. Beals' opinion and stated the exact same statement as he did regarding Dr. Beals' physical RFC evaluation. *Id.* at 36. While the ALJ did not articulate very well his reasoning as to why Dr. Beals' opinions were not substantially supported by evidence, he did not categorically bar considerations of any post-DLI medical evidence as prohibited by *Bird*. The ALJ first summarized and briefly addressed each of Dr. Beals' opinions. *Id.* at 35-36. The ALJ then continued on to discuss Ms. Gadbois' history of immune deficiency and, in fact, considered evidence outside her DLI. *Id.* For instance, the ALJ discussed Dr. Kantar's progress notes from May 17, 2012 and, unlike with Dr. Beals, found no consistency issues with them. *Id.* at 35. The ALJ also considered Ms. Gadbois' physical examinations after her DLI. *Id.* at 36 (noting her November 2012 physical examination was within normal limits). The ALJ even considered Ms. Gadbois' daily activities in August of 2012. *Id.*; *Banks v. Colvin*, No. 4:13CV77, 2014 WL

2696694, at *11 (E.D. Va. June 13, 2014) (finding the ALJ satisfied *Bird* by not categorically baring post-DLI medical evidence as a whole and by finding the ALJ's reason that on post-DLI opinion was "inconsistent with evidence of the claimant's condition through her date last insured" to be a satisfactory reason). Though the ALJ provided sparse reasoning as to Dr. Beals in particular, he considered all evidence in the record, including that from both before Ms. Gadbois' onset date and after her DLI. Accordingly, the undersigned finds the ALJ gave retrospective consideration to the medical evidence created after Ms. Gadbois' DLI, and therefore, the ALJ's assessment was not contrary to *Bird*.

## C. The ALJ Weighed the Treating Physician's Opinion in Accordance with the Required Rules and Regulations.

Ms. Gadbois argued that the ALJ failed to properly address the treating physician evidence by failing to comply with 20 C.F.R. § 404.1527. ECF No. 12. The Commissioner responded that the ALJ properly considered and weighed the evidence of record, including the opinions of Dr. Beals, and "substantial evidence supports the weight the ALJ afforded to Dr. Beals' opinions." ECF No. 14 at 17. As mentioned, *supra*, the ALJ found that Dr. Beals' opinions were made long after September 30, 2011, the date last insured, and were inconsistent with Ms. Gadbois' extensive activities of daily living and conservative treatment history.

The ALJ determines the weight of each medical opinion. 20 C.F.R. §§ 404.1527, 416.927. Under the Treating Physician Rule, the opinion of a claimant's treating physician will be given great weight, and such opinion may be disregarded "only if there is persuasive contradictory evidence in the record." *Coffman v. Brown*, 829 F.2d 514, 517 (4th Cir. 1987).

However, a treating physician's opinion is not automatically assigned controlling weight. *Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) ("The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'"). If any of the evidence is inconsistent, the ALJ must decide which evidence should receive controlling weight. 20 C.F.R. §§ 404.1527(c)-(d), 416.927(c)-(d). "The regulations provide that a treating physician's opinion is entitled to controlling weight only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.

If the treating doctor's opinion is inconsistent with other substantial evidence in the record, or is not well supported by medically acceptable techniques, that opinion will not be given controlling weight. *Baxter v. Astrue*, No. 3:11-CV-679, 2013 WL 499338, at *4 (E.D. Va. Feb. 7, 2013). Further, the treating physician's opinion will not be given controlling weight if the physician opines on an issue reserved for the Commissioner, including whether the claimant is disabled for employment purposes. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); 20 C.F.R. §§ 404.1527(d)(3), (e), 416.927(d)(3), (e). Pursuant to 20 C.F.R. § 404.1527(c), unless a treating physician's medical opinion is afforded controlling weight, the ALJ must consider non-exhaustive factors, which include whether: (1) the physician has examined the claimant; (2) the physician has treated the claimant, and the nature, extent, and length of the treatment relationship; (3) the medical opinion is supported by relevant evidence, particularly medical signs and laboratory findings; (4) the opinion is consistent with

the record as a whole; (5) the treating physician is a specialist in the field of which he is opining; and (6) other factors. 20 C.F.R. § 404.1527(c)(1)-(6). The ALJ is also required to articulate the reasons for the weight given to a treating source's medical opinions. 20 C.F.R. § 404.1527(d)(2).

The ALJ did not give controlling weight to Dr. Beals' opinions because of the inconsistences with objective medical evidence in the record. R. 35-36. After Ms. Gadbois was diagnosed with Lyme disease in 2009, Dr. Levin began treating her, prescribing medication and instructing her to follow a yeast-free diet. *Id.* at 363. Within the next month, Ms. Gadbois reported that her migraines were less frequent. *Id.* In May of 2010 when Dr. Beals began treating Ms. Gadbois, he reported her overall abilities to be relatively normal. *Id.* at 453-54. He found that Ms. Gadbois appeared to have normal physical abilities such as gait and movement of the neck, a normal chest and lung exam, normal cardiovascular exam, normal abdomen, normal neuropsychiatric exam, and a normal musculoskeletal exam with normal strength, tone, range of motion, and no pain. *Id.* Thus, Dr. Beals' November 2012 conclusion that Ms. Gadbois was unable to work between her onset date and her date last insured contradicted his May 2010 assessment. Further, the determination of inability to work is a determination for the ALJ to make and treating physician opinions, though persuasive, are not controlling, especially when they are inconsistent with the objective medical evidence as a whole. *Jarrells*, 2005 WL 1000255, at *4 (explaining that it is within the province of the ALJ to determine the disability status for employment purposes); 20 CFR §§ 404.1527(d)(3), (e).

Dr. Beals' opinions are also inconsistent with Ms. Gadbois' daily activities at that time and those opinions of other physicians. In his November 26, 2012 letter, Dr. Beals found that

Ms. Gadbois' decreased cognition and vision problems inhibited her from focusing on the computer for more than a few minutes, that her headaches and joint or muscle pain required her to change positions ever ten minutes and that she frequently used oxygen and blood pressure monitoring. R. 1060-61. In May of 2011, less than a week after Dr. Beals' initial assessment, Dr. Kilhenny indicated that Ms. Gadbois was walking a mile or two a day. *Id.* at 407. Dr. Kilhenny examined Ms. Gadbois' vision and found no evidence of tremors and only a slight visual field constriction but her vision exam was essentially unremarkable overall. *Id.* at 406-07. Further, in March of 2011, Dr. Westcott conducted a visual efficiency and information processing test on Ms. Gadbois, finding that her eyes appeared to be healthy, free of disease, and that her significant nearsightedness can be corrected with glasses. *Id.* at 578. Dr. Westcott found that Ms. Gadbois had some eye tracking and control problems but prescribed her a computer-based assisted software program that helps with developing eye teaming.

In July of 2011 Ms. Gadbois reported to a pulmonologist, Dr. Silva, as she was having issues with shortness of breath. *Id.* at 768. After examination, Dr. Silva put Ms. Gadbois on an oxygen supplement. *Id.* at 771. A month and a half later Dr. Silva reported that Ms. Gadbois' pulmonary issues appeared to be ameliorating and that remained active and exercising. *Id.* A month later Dr. Silva found that Ms. Gadbois' improvements no longer warranted the use of oxygen. *Id.* at 792. On May 17, 2012, according to Dr. Kantar, Ms. Gadbois was feeling better and was less dizzy, less weak, less tired, and was breathing better. *Id.* at 806. Lastly, Dr. Kantar indicated that Ms. Gadbois was able to run up to ten miles a week and go to the gym. *Id.*

Overall, the undersigned finds substantial evidence in the record supports the ALJ's rejection of Dr. Beals' opinions. Dr. Beals' conclusions were inconsistent with his own

examination findings, objective medical evidence in the record, and Ms. Gadbois' ability to perform certain daily activities during that time period. The ALJ's decision to reject Dr. Beals' opinions as inconsistent with Ms. Gadbois' extensive activities of daily living and conservative treatment history is supported by substantial evidence. *Cf. Lusardi v. Astrue*, 350 F. App'x 169, 172 (9th Cir. 2009) (finding it unnecessary for the ALJ to address all 20 C.F.R. § 404.1527(c(1)-(6) factors) (unpublished).

**D. The ALJ's Hypothetical to the VE Conveyed Ms. Gadbois' Established Limitations.**

Ms. Gadbois argued that the ALJ failed to include limitations of extreme fatigue, migraine headaches, muscle fatigue, bad days, loss of balance, vision impairment, and use of an oxygen machine when posing a hypothetical to the VE. ECF No. 12 at 24. The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform. *Shinaberry v. Comm'r of Soc. Sec. Admin.*, 535 F. Supp. 2d 604, 673 (N.D.W. Va.) *aff'd sub nom. Shinaberry v. Soc. Sec., Com'r*, 293 F. App'x 223 (4th Cir. 2008) (citing *Walker*, 889 F.2d at 50). The ALJ's hypothetical to the VE must be based on the credible medical evidence in the record. *See Hammond v. Heckler*, 765 F.2d 424, 425-26 (4th Cir. 1985). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." *Walker*, 889 F.2d at 50. The hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe, *Benerate v. Schweiker*, 719 F.2d 291, 292 (8th Cir. 1983); *Carter v. Apfel*, No. 5:97-600, 2001 WL 40795 (S.D. W. Va. Jan. 17, 2001), as it is the duty of the ALJ to "insure that the record contains sufficient evidence upon which to make an

informed decision," *Blankenship v. Astrue*, No. 3:11-CV-00005, 2012 WL 259952, at *13 (S.D.W. Va. Jan. 27, 2012). At the hearing however, Ms. Gadbois' attorney questioned the VE, asking specifically:

> [I]f this individual had the following limitations as testified here today: suffering from extreme fatigue, migraine headaches which keep her debilitated for . . . 24 to 48 hours at a time; muscle fatigue where she has, at least four-fifths of the time, days where she is not able to function at all, would not be able to make it to work; a person who continuously has a loss of balance; vision problems with convergence insufficiency; has to wear an oxygen machine when she's out and about . . . going to work, would that person be able to perform any of these jobs?

R. 77-78. The VE responded that these limitations would not allow an individual to hold competitive employment due to the fact that the individual would be missing more than a day and a half a month of work on an ongoing basis. R. 78.

Ms. Gadbois essentially argued that the ALJ improperly relied upon his own hypothetical that did not include the above impairments mentioned by Ms. Gadbois' attorney.[4] ECF No. 12 at 24-25. Contrary to Ms. Gadbois' argument, the ALJ is not obligated to include restrictions in the hypothetical question to the VE that exceed the credible limitations of Ms. Gadbois, as established in the RFC determination. *Johnson*, 434 F.3d at 659 (holding that an ALJ's

---

[4] The hypothetical posed by the ALJ proceeded as follows:

ALJ: Assume that I were to find that the claimant, or a hypothetical individual, would possess a residual functional capacity allowing for sedentary work as defined in the regulations, except this individual cannot engage in climbing; or work at unprotected heights or around dangerous machinery; no operation of a motor vehicle or motorized conveyance; and no exposure to extreme temperatures, hot or cold; or bright lights. Considering the claimant's age, education, and work experience, are there jobs she could perform?

VE: Well, I think there are entry-level jobs that such a person could perform. There are work – there is work involving the use of the telephone, for example, work as a telephone solicitor. There are over 3,700 positions such as that in Virginia, and over 258,000 in the national economy, . . . or work as an order clerk.

ALJ: Excuse me. Is that sedentary and unskilled?

VE: It is sedentary . . .

hypothetical question is valid when it reflects the RFC finding that was supported by substantial evidence in the record); *see also Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (finding that an ALJ's hypothetical question must only include those severe impairments or limitations for which there is support in the record). "[A]n ALJ has 'great latitude in posing hypothetical questions' and need only include limitations that are supported by substantial evidence in the record." *Shinaberry*, 535 F. Supp. 2d at 637 (citing *Koonce v. Apfel*, 1999 WL 7864, 166 F.3d 1209 (4th Cir.1999)). For instance, in *Lee v. Sullivan*, the plaintiff's counsel sought to counter the VE's testimony that the plaintiff could work by adding to the plaintiff's disability a requirement that the plaintiff be permitted to recline several times a day during work. 945 F.2d 687, 692 (4th Cir. 1991). The court held that the requirement of reclining several times a day was not sustained by the evidence, and the vocational expert's testimony in answering the question was without support in the record because no physician suggested that the plaintiff's condition required such reclining. *Id.*

Though the record contains subjective complaints by Ms. Gadbois regarding impairments such as fatigue, migraines, loss of balance, vision problems, and the need for an oxygen mask, the record does not support the limitations posed by Ms. Gadbois' counsel that Ms. Gadbois would be debilitated for twenty-four to forty-eight hours at a time or were she would be unable to function for four-fifths of the time, or where she would have to permanently wear an oxygen machine when she is out and about prior to her DLI. Quite contrarily, the record contains substantial evidence that medication and a gluten-free diet helped Ms. Gadbois' migraines, R. 362-63, that she had fairly normal physical examinations, *id.* at 453-55, and that though she had trouble with eye teaming and tracking in March of 2011, Dr. Westcott, she was prescribed a

computer-assisted vision therapy program to ameliorate the condition, and that by May of 2011 she was "feeling better, [with] less dizziness, weakness, [was] breathing better, [had] less fatigue, [and was] able to run 10 miles a week and [go to] the gym" by May of 2012, *id.* at 806.    Also, though Ms. Gadbois started using an oxygen machine in July of 2011, *id.* at 771, the record indicates that in a follow-up a month and a half later she had improved and remained quite active and no longer needed oxygen twenty-four hours per day, *id.* at 790-92.  The ALJ reasonably did not consider Ms. Gadbois' attorney's more extreme limitations when posing a hypothetical to the VE and relying upon it in determining Ms. Gadbois' RFC.  *See Blankenship*, 2012 WL 259952, at *12 (finding the claimant could still perform several types of jobs classified as sedentary even though the claimant's attorney questioned the VE at length assuming more severe exertional restrictions because none of the medical sources opined that claimant had anything more than moderate limitations of her mental/emotional ability to engage in substantial gainful activity); *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir.2009) (permitting the ALJ to assume that the claimant's attorney will present limitations in accordance with creating the strongest case for the claimant); *cf. Clark v. Shalala*, 28 F.3d 828, 831 (8th Cir. 1994) (noting that "[t]he ALJ need not resort to a vocational expert if the ALJ finds, and the record supports the finding, that the claimant's nonexertional impairments do not diminish the claimant's ability to perform the full range of activity listed in the guideline").    Accordingly, the undersigned finds that the ALJ's hypothetical was based on substantial evidence in the record, and therefore, the ALJ properly relied on the VE's testimony to his question.

## VI.  RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** Ms. Gadbois' Motion for Summary Judgment, ECF No. 11, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 13, be **GRANTED**; the final decision of the Acting Commissioner be **AFFIRMED**, and that judgment be entered in favor of the Defendant.

## VII.  REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d).  A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made.  The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

32

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for the Plaintiff and the Defendant.

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 28, 2015

33